**MIDLAND INSURANCE COMPANY,**
Plaintiff-Appellee Cross Appellant,

v.

**MARKEL SERVICE, INCORPORATED,**
Defendant-Appellant Cross Appellee.

No. 75–2134.

United States Court of Appeals,
Fifth Circuit.

March 14, 1977.

W. Richard Bernays, Dallas, Tex., for defendant-appellant cross appellee.

Tom M. Lorance, Wayne Adams, Houston, Tex., for plaintiff-appellee cross appellant.

Before BROWN, Chief Judge, and HILL and FAY, Circuit Judges.

JAMES C. HILL, Circuit Judge:

The plaintiff-appellee, Midland Insurance Company ("Midland"), alleges that the defendant, Markel Service, Inc. ("Markel"), misrepresented and concealed certain information, thereby causing Midland to incur a loss from its failure to cancel a policy of excess liability insurance. The plaintiff alleged damages in the amount of two hundred sixty thousand dollars ($260,000), the entire amount of a payment made to the insured covered by the liability policy in question. Upon the jury's finding of liability, however, the district court awarded damages in the amount of one hundred fifty thousand dollars ($150,000), which represented the difference between the insured's actual primary coverage for injury or death to one person ($100,000) and the amount of such coverage which Midland believed to be in effect at the time the loss occurred ($250,000).[1] Markel brings this appeal from the finding of liability and Midland cross appeals, seeking to increase the amount of damages from $150,000 to $260,000.

### I. The Facts.

Midland, an insurance company, brought this suit against Markel, an insurance broker, for damages allegedly sustained when Midland made payment for a loss sustained by one of its insureds, a truck line known as Zero Refrigerated Lines ("Zero"). Zero initially had in force a policy of automobile liability insurance with prescribed limits of $100,000 for injury or death to one person, $300,000 liability for any one accident, and $50,000 liability limit for property damages (100,000/300,000/50,000).

Zero wished to obtain excess liability coverage exceeding these limits and, to that end, it called for bids for such insurance through its agent, Jacob Rubiola & Co. ("Rubiola") of San Antonio. Rubiola contacted, among others, Markel, who apparently submitted the lowest bid for the insurance and placed the policy with Midland.

As a result of misinformation conveyed by one of Markel's employees, Midland erroneously indicated in the policy which it first issued that Zero had underlying primary coverage with limits of 250/500/100, but these figures were corrected by an endorsement showing the actual underlying limits of 100/300/50. At the time the endorsement was issued, Midland and Markel also reached an understanding that Midland would review the policy on its anniversary date, March 20, 1973.[2]

---

1. This figure also represents the difference between Midland's actual excess liability for its insured's loss ($260,000) and the amount of liability it would have incurred ($110,000) if the primary coverage had been maintained at the $250,000 level.

2. An employee of Midland, Louis V. Liggio, stated in his deposition that he had explained

Zero's policy was in fact "reviewed" in early 1973 when an employee of Midland, Michael Corken, sent a letter to Markel on January 18, 1973, stating as follows:

In reviewing the captioned file, I note that Lou Liggio had various conversations with you in which he advised that we require automobile underlying limits of $250/500,000—BI (bodily injury) and $100,000—PD. (property damage).

Please be advised that unless the underlying automobile limits are increased to the above required minimum limits (250/500/100), we will have no other alternative but to allow you ample time to replace us as a carrier for this account or cancel our policy.

Markel responded to this communication by a letter to Corken, dated January 30, 1973, which stated:

Dear Mike:

*We have been advised* that the Home Insurance Company *will be* the renewal primary carrier with limits of 250/500/100. *As soon as we have confirmed this* and have obtained a policy number we will forward to you prior to the March 20 deadline.

> Cordially yours,
> Edward E. Jacke,
> Resident Vice-President

(emphasis added).

The limits of underlying coverage, in fact, had not been raised and Markel was so advised by the insured's agent, Rubiola, by letter of February 13, 1973.[3] Markel, however, did not advise Midland that lower limits remained in effect until after a serious accident occurred in California on May 26, 1973, involving a Zero truck and resulting in the death of one person.[4] The claim against Zero by the decedent's survivors was compromised and settled by the payment of $100,000 by the primary carrier, and the payment by Midland of an additional $260,000. The total settlement amount ($360,000) was stipulated by the parties to be reasonable.

Midland presented testimony to the effect that it would have cancelled Zero's excess liability policy but for the representation in Mr. Jacke's January 30 letter that the limits of its primary coverage would be raised to 250/500/100. Mr. Corken testified that, if he had been informed that the lower limits were still in effect after his January 18 letter, he would have waited until March 20, the policy anniversary date, to see whether the limits had been increased and, if they had not, he would have cancelled the policy as indicated in his letter.[5] Corken testified that he was aware of the agreement between Liggio and Horvath to "review" the policy on its anniversary date.

to Tom Horvath, a branch manager of Markel Service, that Midland "would stay with the risk, with the underlying of 100/300 up until the anniversary period which would have been the preceding year (sic) or March 20 and he agreed to this and I went ahead with the issuance of the endorsements." This statement was made in a telephone conversation which took place on May 10, 1972. Horvath later confirmed this understanding in a letter to Liggio, dated May 17, 1972, in which he stated "I have discussed this risk with Mr. Ed Jacke of our office and have indicated to him that this policy will be reviewed on its anniversary date of March 20, 1973."

3. Midland also presented evidence that Jacke may have known that the limits had not been increased even before he wrote the January 30 letter. The agent who placed Zero's primary liability coverage with Home Insurance Company, Burton Barnes, testified that he informed Mr. Jacke "sometime around January 26th or 27th" that the limits of Zero's primary coverage were 100,000/300,000/50,000. Although Barnes did not unequivocally state that his conversation with Jacke took place before January 30, the credibility of his testimony was a matter for the jury to evaluate during the course of its deliberations.

4. After the loss, an employee of Midland telephoned Markel to inquire as to the limits applicable to Zero's primary coverage. In response, on June 15, Markel forwarded to Midland Rubiola's February 13 letter advising Markel that the Home Insurance Company's primary coverage had limits of 100/300/50. The record shows that Markel had received Rubiola's letter on February 15.

5. The existence of an agreement to review the coverage after one year was also confirmed by the insured's agent, Rubiola, who testified that Midland had the option to review the coverage and cancel the policy after one year.

Moreover, Corken had written a notation on his copy of Liggio's letter of April 24, 1972, that "LVL [is] going to cancel unless primary raised to 250/500/100." "LVL" refers to Mr. Liggio.

## II. *Disposition in the District Court.*

The district court submitted to the jury ten issues relating to the question of Markel's liability. The jury's responses to the first four issues established that Markel misrepresented the facts to Midland as to the liability limits of Zero's primary coverage, that such misrepresentations were material and that Midland's reliance on such misrepresentations resulted in a loss. The jury's responses to issues five and six established that Markel concealed a material fact from Midland in connection with Zero's liability policy and that such concealment resulted directly in a loss to Midland. The jury's responses to issues seven and eight, however, established that Midland had failed to exercise ordinary care in handling Zero's insurance coverage and that such failure was the proximate cause of its loss.[6]

After the jury returned its answers to the ten issues submitted by the court, both parties filed motions to disregard certain of the jury's conclusions. Midland filed a motion to disregard the jury's answers to issues seven and eight, which concluded that Midland's failure to use ordinary care was the proximate cause of its loss. Midland contended that contributory negligence could not be raised as a defense to a cause of action based upon misrepresentation, concealment of material facts or breach of agency duty. Midland's motion also sought judgment awarding damages in the amount of $260,000 plus costs. Markel moved the court to disregard the jury's answers to issues one through six and for judgment N.O.V. Markel alleged that there was no evidence to support submission to the jury of issue number five, concerning conceal-

ment of a material fact. Markel contended that the issue, as presented, did not limit its liability to acts of willful or deliberate concealment, but would have permitted a finding of liability based on an inadvertent or negligent failure to convey information to Midland.

On March 17, 1975, the trial court entered judgment, concluding that the defense of contributory negligence was unavailable to Markel in an action for misrepresentation, concealment of material facts or breach of agency duty and granting Midland's motion to disregard the jury's answer to issues seven and eight, concerning contributory negligence.[7] In addition, the court denied Markel's motion to disregard the jury's answers to issues one through six and entered judgment on behalf of Midland in the amount of $150,000 with interest thereon at six (6%) percent until paid. Midland thereafter moved the court to alter its judgment to provide for $260,000 damages, which motion was denied.

## III. *Appellant's Contentions on Appeal.*

■ Markel's attack on the jury's finding of liability has a dual thrust. Predictably, Markel first contends that the jury's conclusions are unsupported by the evidence presented. Markel next contends that the district court erred in its jury charge and interrogatory concerning concealment of a material fact. Before considering Markel's claim of insufficient evidence, we note that the trial court was also called upon to weigh the evidence when it considered Markel's motion for instructed verdict and for judgment N.O.V. In its consideration of these motions, the district court was required to apply a federal, rather than a state, test for the sufficiency of the evidence to create a jury question. *Boeing v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc). Thus, contrary to Markel's position

---

6. In its responses to issues nine and ten, the jury concluded that Markel had not acted with malice in making the misrepresentation to Midland and that an award of exemplary damages was therefore inappropriate.

7. This ruling, which was made in response to Midland's contention that contributory negligence may not be raised as a defense to a cause of action based upon misrepresentation, concealment of material facts or breach of agency duty, is not challenged on appeal.

that this appeal is governed by the "any evidence" rule applicable in the state of Texas, the standard applicable to this case, both in district court and on appeal, is the "substantial evidence" or "reasonable man" standard set forth in *Boeing*.

■ Viewing the evidence in the manner required by *Boeing*, we conclude that the facts of record contain substantial evidence to support the conclusion of the jury. The jury could have reasonably concluded from the evidence, although it was disputed, that Markel misrepresented the facts to Midland concerning the limits of Zero's primary liability coverage, that such misrepresentations were material, and that Midland's reliance on the misrepresentations resulted directly in the loss to Midland. Similarly, there was ample evidence, although conflicting, from which the jury could have concluded that Markel concealed a material fact which resulted in a direct loss to Midland. Because the evidence presented a jury question, and since our review of the record, even when it is viewed in the light most favorable to Markel, reveals substantial evidence to support the verdict, we conclude that the district court properly overruled the motions for instructed verdict and for judgment N.O.V. Furthermore, since we have concluded that the jury's finding of liability was based on substantial evidence that Markel misrepresented a material fact, we find it unnecessary to consider Markel's contention that the district court erred in its jury charge and interrogatory concerning concealment.[8]

## IV. *Midland's Cross Appeal.*

■ In order to obtain recovery of the entire sum that it was required to pay for Zero's loss, Midland seeks to increase from $150,000 to $260,000 the damages awarded by the district court. Markel, on the other hand, contends that Midland's damages, if any, should be limited to what Midland's liability would have been if the primary limits had been increased. Midland predicates its claim for higher damages on the assertion that it would have cancelled Zero's policy on March 20, 1973, the policy anniversary date, if it had not been informed by Mr. Jacke that the primary limits would be increased and if the limits had not actually been increased by that date.

In order to prevail on this argument, Midland must show that at least two facts are established in the record. First, it must show that there was an understanding with Markel to review the policy on its anniversary date. Second, it must prove that such a review would have resulted in cancellation of the policy. With respect to the first of these facts, we are convinced that there was an agreement to review the policy on its anniversary date. That such an understanding existed is abundantly clear from the testimony of Michael Corken, from the testimony of Zero's agent, Rubiola, and from Corken's January 18, 1973 letter referred to above.

Markel disputes Midland's contention that the policy would have been cancelled on March 20, 1973, but for the misrepresentation contained in Jacke's letter. With regard to the second essential fact, Markel relies on Midland's letter of January 18, 1973, which contained the warning that ". . . unless the underlying automobile limits are increased to the above required limits, we will have no other alternative but to allow you *ample time* to replace us as a carrier for this account or cancel our policy." Noting that "ample time" is undefined and that the policy provided for at least thirty days notice before cancellation, Markel argues that the policy might not have been cancelled before the accident occurred in May. Markel bolsters its argument by pointing out that Midland did not actually cancel the policy until October 28,

---

8. In view of the jury's finding of liability for both misrepresentation and concealment, we are unsure whether Midland is pursuing its claim of concealment on appeal. Midland's brief contains the following statement: "The finding of concealment, in view of the jury's

Issues 1 through 4, could be considered moot and superfluous, correctly submitted or not." Although appellant Markel, in its attack upon the jury's findings, discussed this issue in its brief, Midland did not. Moreover, neither party discussed the issue during oral argument.

1973, or more than four months after it was informed, sometime in early June, of the lower primary limits. Although Midland made known its intention to cancel the policy of Markel did not meet its terms, we do not believe that Midland has proven to a certainty that Zero's policy actually would have been cancelled before the accident occurred in May, 1973. Thus, we affirm the district court's determination of Midland's damages.

AFFIRMED.